<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MICHAEL BLACKNALL,                    :
                                      :      Civil Action No. 10-1271 (FLW)
              Petitioner,             :
                                      :
         v.                           :      **OPINION**
                                      :
MARIE DUNLAP-PRYCE,                   :
                                      :
              Respondent.             :


**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>              Counsel for Respondents
Michael Blacknall                   Mary R. Juliano
Mid-State Correctional Facility     Mounmouth Co. Pros. Ofc.
P.O. Box 866                        Monmouth County Court House
Wrightstown, NJ 08562               71 Monument Park
                                    Freehold, NJ  07728-1261


**WOLFSON**, District Judge

     Petitioner Michael Blacknall, a prisoner currently confined

at Mid-State Correctional Facility in Wrightstown, New Jersey,

has submitted a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  The respondent is the warden Marie Dunlap-

Pryce.

     For the reasons stated herein, the Petition must be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

Karen Esposito was the State's principal complaining witness. She testified that on May 26, 2007, she was walking through Lake Topanemus Park in the morning hours of the day when a man seated on a park bench called out to her.  This man, later identified as defendant, asked Esposito to take his picture.  When Esposito agreed, defendant handed her the camera, "took out $20 and said, 'Here's $20.  Let's go over there,' and pointed towards the woods."

Because this request made her nervous, Esposito offered to take the picture where she was standing. According to Esposito, defendant responded by saying: "'No, no, no.  Here's $20.  Let's go over there', and pointed to the woods."  Fearing for her safety, Esposito dropped the camera on defendant's lap; she then pretended that she saw her father's car, and told defendant that she would return immediately after she informed her father of her whereabouts.  Esposito explained that defendant was insistent, however, stating:  "No, no.  We'll do it real quickly let's just do it now[,]" to which she responded "No, no.  Wait here, I'll be right back."  As she backed away, defendant asked for her name, to which she replied "Laura."

Esposito ran from the scene, eventually encountering a couple who were walking on a nearby pedestrian path.  She asked them to remain with her as she called the police to report this incident. Officers James McNamara and Frank Mount responded to

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

the park on a report of a woman being lured into the woods.  The description of the individual given to police was a "black male, medium build, bald head, wearing blue shorts, sneakers and a blue tank top."

As he walked on the trail near Robertsville Road, McNamara saw a parked car.  After he called in the vehicle's license plate number, McNamara continued walking until he came upon a man fitting Esposito's description sitting on a bench with his shorts partially down.  McNamara noticed that the man had a blanket next to him.

At this point, defendant grabbed the blanket, stood up and turned away.  McNamara drew his weapon and ordered defendant to drop the blanket; defendant was immediately handcuffed upon showing his hands.  When the blanket fell to the ground, a part of defendant's genitals were exposed.  With McNamara's assistance, defendant eventually pulled up his pants and sat down.

As these events unfolded, Officer Simonetti arrived at the scene in time to see "something get released from [defendant's] hand."  This item was later identified as a "crack pipe" that tested positive for a trace amount of cocaine.  Also found next to defendant were three pornographic magazines, a digital camera, a box of tissues, a lighter and a broken wire hanger that, according to McNamara, is used to clean crack pipes.  The police also confirmed that the car parked nearby was registered to defendant.

Before advising defendant of his <u>Miranda</u>[fn2] rights, Simonetti asked defendant whether the items found nearby belonged to him, to which defendant responded "yes."  Simonetti then asked defendant what he was doing at the park; defendant replied that he was just "hanging out."

[fn2] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Simonetti placed the items recovered in his patrol car for transportation to police headquarters.  Despite its possible probative value, the lighter was discarded "because the jail [would not] take it."

Notwithstanding these preliminary pre-<u>Miranda</u> inquiries, the record shows that the arresting officers informed defendant of his rights under <u>Miranda</u> before transporting him to police headquarters.  Once at headquarters, Simonetti again advised defendant of his <u>Miranda</u> rights, then asked defendant to initial and sign a standard <u>Miranda</u> waiver form at 11:19 a.m., approximately one hour from the point of arrest.  The trial court found that defendant knowingly and voluntarily signed the waiver form.

Armed with defendant's written waiver of his rights under <u>Miranda</u>, Simonetti questioned defendant about his activities in the park that lead to his arrest.  According to Simonetti, defendant said that "he was in the park playing with himself, masturbating. He was smoking crack cocaine and he was trying to get some female to take his picture."

Defendant called four witnesses.  Dr. Chang Soo Kim, a board certified plastic surgeon, testified that on May 14, 2007, (twelve days before the incident leading to defendant's arrest) defendant was admitted to CentraState Medical Center in Freehold for traumatic injuries to the right side of his face.  Dr. Kim described in detailed the nature of these injuries and the surgery performed to repair the physical damage.

Sidney Blacknall, defendant's father, testified that he borrowed his son's camera one week before his arrest.  He developed the film and found three photographs depicting defendant.  Dawn Dupre, a civilian dispatcher at the Freehold Police Department, testified that she was on duty when Esposito called to report the incident in the park.  Finally, Defendant called a private investigator who photographed the area where the incident with Esposito, and defendants' subsequent encounter with the police, allegedly occurred.  These pictures were admitted into evidence.

(Superior Court of New Jersey, Appellate Division, Opinion of

October 16, 2009, at 2-6.)

B.   Procedural History

Petitioner was indicted in Monmouth County, New Jersey, on one count of third-degree attempted luring or enticing of an adult, N.J.S.A. 2C:13-7, and one count of third-degree possession of cocaine, N.J.S.A. 2C:35-10a(1).  Following a jury trial, he was convicted of the drug offense and of the petty disorderly-person offense of harassment, N.J.S.A. 2C:33-4, as a lesser-included offense of attempted luring or enticing.  The Court sentenced Petitioner to a term of four years' imprisonment on the drug offense and to a concurrent thirty-day term on the petty disorderly person offense.

Prior to trial, Petitioner filed several motions.  He moved for dismissal of the Indictment, on the grounds that police had deliberately destroyed the 9-1-1 tape, as well as other records, which motion was denied.  The trial court found that the tape was not purposely destroyed and that, in any event, it did not contain evidence critical to Petitioner's defense.  (Answer, Ex. 3.)  In addition, Petitioner moved for suppression of evidence seized at the time of his arrest, on the grounds that the search was unlawful.  The trial court found that the physical evidence was properly seized either as evidence in plain view or as incident to Petitioner's arrest.  (Answer, Ex. 4.)  Finally, Petitioner moved to suppress the statements he made to police, on the grounds that he was not given the appropriate Miranda

5

warnings.  The trial court suppressed the statements Petitioner made to police in the park, prior to being given the Miranda warnings, but denied the request to suppress the statements given at the police station following Petitioner's waiver of his Miranda rights.  (Answer, Exs. 4, 5.)  The trial court also denied Petitioner's motion for reconsideration of the suppression order.  (Answer, Ex. 5.)

On October 16, 2009, the Appellate Division affirmed Petitioner's conviction and sentence.  On January 28, 2010, the Supreme Court of New Jersey denied certification.  This Petition followed.  Respondents do not dispute that Petitioner has exhausted his state remedies and have answered on the merits. Petitioner has replied.  This matter is, therefore, ready for disposition.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

6

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

7

where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein). In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the

8

state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." <u>Simmons v. Beard</u>, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).

### III.   <u>ANALYSIS</u>

A.   <u>Fourth Amendment Search and Seizure Claim</u>

Petitioner asserts that the police wrongfully seized certain evidence at the time of his arrest, which they later introduced at trial. Petitioner asserts that the evidence was wrongfully

seized as the police did not have probable cause at that time to believe that Petitioner had committed a crime.  More specifically, prior to trial Petitioner moved to suppress the crack pipe and some pornographic magazines seized at the time of his arrest.  The trial court denied the motion, finding that the materials were seized in plain view and as the result of a search incident to a lawful arrest.[2]  Petitioner contends that the arrest was not lawful; hence, the crack pipe was not lawfully seized.

> As far as the motion to suppress in this particular case, I see no legal basis to suppress those items.  The police officers responded to a call when the officer came upon this particular defendant, he observed him with his pants partially down, his penis exposed, and he saw items in plain view on the ground near him, which he felt were contraband they could obviously see them, so.  You know he was entitled to seize those items under the plain view exception.
>
> And he was also entitled to seize them as a search incident to arrest his immediate area.  The police officer was in a place that he was entitled to be.  He

---

[2] At the suppression hearing, Officer McNamara testified that Petitioner initially crouched away from the officer and that it was Officer McNamara's belief that Petitioner was dropping the crack pipe before responding to Officer McNamara's instruction to Petitioner to show him his hands.  He further testified that he and Officer Simonetti searched the immediate area and found the pipe.  Officer Simonetti testified that he found the pipe on the ground next to Petitioner's feet.  (Answer, Ex. 4, Tr. of Dec. 20, 2007, at 24-28, 37-38.)  Also at the suppression hearing, Petitioner argued that the crack pipe was not his, so he limited his Fourth Amendment claim to the seizure of pornographic magazines taken out of an envelope at the scene.  (Answer, Ex. 4, Tr. of Dec. 20, 2007, at 54.)  In any event, the trial court addressed all of the evidence seized at the scene of Petitioner's arrest.

> wasn't particularly searching for any particular physical evidence at that particular time and the contraband that he saw, was obvious that it was contraband.  So either plain view or search incident to arrest, the seizure of those items were justified.

(Answer, Ex. 4, Tr. of Dec. 20, 2007, at 54-55.)  The Appellate Division found that this allegation of error lacked sufficient merit to warrant discussion.

The Fourth Amendment to the U.S. Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

Generally, speaking, evidence gained through a Fourth Amendment violation may not be used against a defendant at trial. See Mapp v. Ohio, 367 U.S. at 654-55; Weeks v. United States, 232 U.S. 383, 391-93 (1914).  This "exclusionary rule" is a judicially-created remedy to safeguard Fourth Amendment rights by deterring police conduct that violates those rights.  Stone v. Powell, 428 U.S. 465, 486 (1976).

> In Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court examined the nature of the exclusionary rule, which it characterized as a "judicially created means of effectuating the

11

> rights secured by the Fourth Amendment" and balanced
> its utility as a deterrent against the risk of
> excluding trustworthy evidence and thus "deflect[ing]
> the truthfinding process." Id. at 482, 490, 96 S.Ct.
> 3037. Finding that, as to collateral review, the costs
> of the exclusionary rule outweighed the benefits of its
> application the Court concluded that "where the State
> has provided an opportunity for full and fair
> litigation of a Fourth Amendment claim, a state
> prisoner may not be granted federal habeas corpus
> relief on the ground that evidence obtained in an
> unconstitutional search or seizure was introduced at
> his trial." Id. at 494, 96 S.Ct. 3037. While the
> federal courts are not thus deprived of jurisdiction to
> hear the claim, they are -- for prudential reasons --
> restricted in their application of the exclusionary
> rule. Id. at 494 n. 37, 96 S.Ct. 3037.

Marshall v. Hendricks, 307 F.3d 36, 81-82 (3d Cir. 2002), cert.

denied, 538 U.S. 911 (2003). "Whether the petitioner actually

took advantage of the opportunity is irrelevant; so long as the

opportunity was available, the bar against raising the Fourth

Amendment claims on collateral review applies." Jackson v.

Diguglielmo, 2006 WL 1147517, 6 (E.D. Pa. 2006) (citing Cohen v.

Gillis, 2004 WL 1622026, 3 (E.D. Pa. 2004)).

Moreover, "[a]n erroneous or summary resolution by a state

court of a Fourth Amendment claim does not overcome the bar."

Gilmore v. Marks, 799 F.2d 51, 57 (3d Cir. 1986).

The Court of Appeals for the Third Circuit has recognized

that there may be instances in which a full and fair opportunity

to litigate was denied in state court. See, e.g., Gilmore v.

Marks, 799 F.2d at 57 (observing that a state's "failure to give

at least colorable application of the correct Fourth Amendment

constitutional standard" might amount to a denial of the
opportunity for full and fair litigation); Boyd v. Mint, 631 F.2d
247, 250 (3d Cir. 1980) (assuming, without deciding, that
"opportunity" simply means providing procedures by which one can
litigate a Fourth Amendment claim, Stone v. Powell does not
preclude federal habeas relief when "'the defendant is precluded
from utilizing it by reason of an unconscionable breakdown in
that process,'" (quoting Gates v. Henderson, 568 F.2d 830, 840
(2d Cir. 1977), cert. denied, 434 U.S. 1038 (1978))).

     This case does not present one of those instances in which a
full and fair opportunity to litigate was denied in state court.
To the contrary, Petitioner pursued this claim from pre-trial
motion through the state appellate process.  Accordingly, this
Court will not grant federal habeas relief on this claim.

B.   Miranda Claim

     Petitioner made statements to police, at the park, before he
was provided the Miranda warnings; then, at the police station,
after receiving such warnings and waiving his Miranda rights,
Petitioner made additional statements.[3]  The trial court

---

     [3] Petitioner admits that, at the park, when asked if these
things were his, he said, "Yes."  He disputes that he was
referring to the crack pipe located at his feet, but contends
that he was instead referring to the materials next to him on the
bench.  Petitioner disputes that he made any factual statements
at the police station after receiving his Miranda warnings.
Officers Simonetti testified that, after the Miranda waiver form
was signed, Petitioner made statements to the effect that he was
smoking crack cocaine and masturbating, that he encountered a

suppressed the statements made at the park, but permitted use of the statements made at the police station after Petitioner's receipt of the Miranda warnings.  Petitioner asserts that the trial court should not have admitted his statements made *after* he was provided the Miranda warnings, as such statements were tainted by the government's acquisition of his pre-Miranda statements.  The Appellate Division rejected this claim.

> ... Concerning defendant's arguments attacking the admissibility of statements he made to the arresting officer, we note that the trial court properly suppressed defendant's statements to Simonetti which were obtained before the administration of Miranda warnings.  Additionally, the court correctly denied defendant's motion to suppress incriminating statements he made at police headquarters after he had been given his rights under Miranda and after executing a form waiving those rights.
>
> In State v. O'Neill, 193 N.J. 148, 180-81 (2007), the Court held that "when Miranda warnings are given *after* a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination."
>
> In making that determination, courts should consider all relevant factors, including:  (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights; (2) the proximity in time

---

woman in the park, and that he had a camera and asked her to take pictures of him.  There is no dispute that, to the extent Petitioner made post-Miranda statements, they were not recorded in any form.  At trial, Officer Simonetti was permitted to testify as to the alleged post-Miranda oral statements.  In light of this testimony, the state court finding that Petitioner made such post-Miranda statements is not unreasonable.

and place between the pre-and post-warning
questioning; (3) whether the same law enforcement
officers conducted both the unwarned and warned
interrogations; (4) whether the officers informed
defendant that his pre-warning statements could
not be used against him; and (5) the degree to
which the post-warning questioning is a
continuation of the pre-warning questioning.

[Id. at 181]

The Court specifically rejected a so-called "bright-
line" approach, concluding instead that "[i]n a two-
step interrogation case, courts must view the totality
of the circumstances in light of the relevant factors
and then determine whether the unwarned questioning and
admissions rendered the Miranda warnings ineffective in
providing a defendant the opportunity to exercise the
privilege."  Id. at 181-82.

Here, the administration of Miranda rights at
police headquarters and the subsequent waiver of those
rights by defendant sufficiently severed any connection
to the constitutionally tainted pre-Miranda
interrogation that took place at the park.  The
incriminating statements secured by the police at
headquarters were the product of a constitutionally
valid interrogation, and thus properly admissible at
trial.

In support of this conclusion, we point to the
following factual findings made by the trial court with
respect to the O'Neill factors.  (1) The questioning at
the park was brief and defendant's "admission, although
incriminatory, was not critical in the sense that a
reasonable person coming upon the scene could have
inferred that the items found on the bench were his."
(2) There was a sufficient break between the statements
"in the sense that he was taken to a different
location."  (3) Simonetti and McNamara conducted both
the pre-Miranda and post-Miranda interrogation.
(4) The officers "did not inform the defendant that his
pre[-]warning statements ... could not be used against
him."  (5) "The questioning at the police station was
not a continuation of the pre[-]warning questioning in
the sense that defendant's admission that he had
contact with women was the key admission that he made
and was not part of his pre[-]Miranda discussion."

15

(6) "Defendant has an extensive prior experience with the criminal justice system" and he "fully acknowledged being given his [Miranda] warnings and understanding them ... although he denies making any statements[,] that's a matter for credibility for the jury to determine."  These findings are supported by competent evidence and are thus binding upon us on appeal.  State v. Adams, 194 N.J. 186, 203 (2008) (citing State v. Locurto, 157 N.J. 463, 470-71 (1999)).

(Superior Court of New Jersey, Appellate Division, Opinion of Oct. 16, 2009 at 8-11.)

Pursuant to the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, "No person ... shall be compelled in any criminal case to be a witness against himself ... ."  In Miranda v. Arizona, the Supreme Court of the United States held that:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

16

384 U.S. at 478-79 (footnote omitted).

A waiver may be made orally or may be implied from a suspect's conduct.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Cruz , 910 F.2d 1072, 1080 (3d Cir. 1990), cert. denied, 498 U.S. 1039 (1991).  To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of Miranda rights.  Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  This is a rule of constitutional dimension, violation of which may justify issuance of a writ of habeas corpus.  See generally Dickerson v. United States, 530 U.S. 428 (2000).

> Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

Miranda, 384 U.S. at 473-74.  A defendant's right to cut off questioning must be "scrupulously honored."  Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

"The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But ... '[c]ases in which a defendant can make a colorable argument that

17

a self-incriminating statement was 'compelled' despite the fact
that the law enforcement authorities adhered to the dictates of
Miranda are rare.'"  Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question
requiring independent federal determination," and is thus not
subject to the § 2254(d) presumption of correctness.  Miller v.
Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement
> is involuntary when the suspect's "will was overborne
> in such a way as to render his confession the product
> of coercion." Arizona v. Fulminante, 499 U.S. 279, 288,
> 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining
> whether a statement is voluntary, Supreme Court
> precedent requires consideration of "the totality of
> all the surrounding circumstances--both the
> characteristics of the accused and the details of the
> interrogation." Dickerson v. United States , 530 U.S.
> 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
> (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
> surrounding circumstances include "not only the crucial
> element of police coercion, Colorado v. Connelly, 479
> U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"
> but may also include "the length of the interrogation,
> its location, its continuity, the defendant's maturity,
> education, physical condition, and mental health."
> Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745,
> 123 L.Ed.2d 407 (1993) (some internal citations
> omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary
questions, such as the length and circumstances of the
interrogation, the defendant's prior experience with the legal
process, and familiarity with the Miranda warnings, often require
the resolution of conflicting testimony of police and defendant.
The law is therefore clear that state-court findings on such

matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." Dickerson, 474 U.S. at 117.

Relevant to the enquiry here, the Supreme Court has recently addressed the question whether midstream Miranda warnings can be effective to accomplish their object and to permit admission of statements made in a second round of questioning following Miranda warnings. Considerations bearing on that determination include: the completeness and detail of the questions and answers to the first round of questioning, the two statements' overlapping content, the timing and setting of the first and second rounds, the continuity of police personnel, any advice (or lack thereof) to the detainee as to the admissibility of his first statement, and the degree to which the interrogator's questions treated the second round as continuous with the first. Missouri v. Seibert, 542 U.S. 600, 614-16 (2004) (plurality opinion). See also Oregon v. Elstad, 470 U.S. 298 (1985).

Here, although citing to a state-court decision, the state courts properly considered the factors set forth in Missouri v. Seibert and determined that the statements made in the second round of interrogation, at the police station, were admissible. The decision of the state courts is neither contrary to, nor an unreasonable application of, governing federal law. Nor is the decision unreasonable in light of the facts available to the

state courts.  Petitioner is not entitled to relief on this
claim.

C.   Destruction of Evidence Claim

    Petitioner asserts that he was deprived of his due process
right to a fair trial by the government's destruction of
evidence, specifically, the 9-1-1 tape and the lighter seized at
the park.  Petitioner argues that the 9-1-1 tape was essential to
determine whether the police acted lawfully when they arrested
him.  He argues that the lighter allegedly collected at the scene
could have been tested for fingerprints, thus potentially
exculpating Petitioner.  He also asserts that the destruction of
evidence impaired his ability to meaningfully cross-examine the
police.  The Appellate Division rejected this claim.

> With respect to the State's failure to have
> secured the audio record of Esposito's telephone call
> reporting the incident and the lighter seized at the
> scene, we find no basis to conclude that these events
> were the product of bad faith by the State.  See
> Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333,
> 337, 102 L.Ed.2d 281, 289 (1988).  We further note that
> these items in no way constitute exculpatory evidence.
> See George v. City of Newark, 384 N.J. Super. 232, 243
> (App. Div. 2006).

(Superior Court of New Jersey, Appellate Division, Opinion of
October 16, 2009, at 11-12.)

    In Brady v. Maryland, 373 U.S. 83 (1963), and United States
v. Agurs, 427 U.S. 97 (1976), the Supreme Court held that a due
process violation occurs whenever the government withholds
certain material exculpatory evidence, without regard to the good

or bad faith of the prosecutor.  By contrast, the Court has recognized that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  Arizona v. Youngblood, 488 U.S. 51, 57 (1988).  Instead, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  Id. at 58.  In addition, in order to establish a deprivation of due process, the destroyed evidence must both "possess an exculpatory value that was apparent before the evidence was destroyed" and also "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  California v. Trombetta, 467 U.S. 479, 489 (1984).

Here, the Appellate Division properly relied on Arizona v. Youngblood in determining that there had been no "bad faith" and no due process violation.  In light of the evidence that the arresting officer disposed of the lighter because the jail would not take it into custody as personal property of an arrestee, and that the 9-1-1 tape was destroyed pursuant to an existing document retention policy, because Petitioner had not requested

21

its retention, the state courts' findings of no bad faith were reasonable in light of the evidence before them.

Certainly, moreover, the evidence was only "potentially" exculpating.  Even if Petitioner could have established that his fingerprints were not on the lighter found at the scene, the mere presence of a lighter at the scene would have corroborated Petitioner's statement to police officers that he was smoking crack.  The presence of a lighter at the scene, with or without Petitioner's fingerprints, would have been even more incriminating in light of the presence of a crack pipe at the scene.  Nor can Petitioner establish that he was not able to obtain elsewhere evidence as to the contents of the 9-1-1 tape, which he alleges would have established that the officers had no probable cause to arrest him.  The victim was able to testify as to the substance of her 9-1-1 call.  And one police officer, at least, talked with the victim before approaching Petitioner.  Finally, when the police officers approached Petitioner, he was partially unclothed and they found a crack pipe at the scene, all of which justified their arrest of Petitioner.

The decision of the Appellate Division is neither contrary to, nor an unreasonable application, of governing Supreme Court law, nor is the decision of the Appellate Division unreasonable in light of the evidence before it.  Petitioner is not entitled to relief on this claim.

D.    Grand Jury Indictment

       Petitioner asserts that the prosecutor unlawfully amended
and supplemented the charge of "luring" without a grand jury
finding.  More specifically, the indictment charged Petitioner
with "attempting to lure or entice an adult, to wit: K.E. to a
particular place with the purpose to commit a criminal offense
contrary to the provisions of N.J.S.A. 2C:13-7, and against the
peace of this State, the Government, and dignity of the same."
(Emphasis added.)  The Petitioner moved to dismiss the
indictment, because it failed to specify the "criminal offense"
he was alleged to have the purpose to commit.  The motion to
dismiss the indictment was denied.  (Answer, Ex. 6, Transcript of
Motion to Dismiss.)  The trial court noted that, although the
indictment did not specify the government's theory that
Petitioner's purpose was to commit a sexual assault or sexual
contact, Petitioner was aware of the theory, based upon the grand
jury minutes and other pre-trial proceedings, and also noted that
the charge would be dismissed if the government did not put on
sufficient evidence to sustain a conviction with respect to that
particular criminal purpose.  The Appellate Division found that
this allegation of error lacked sufficient merit to warrant
discussion.

       There is no Fifth Amendment right to indictment by a grand
jury in state court criminal proceedings.  Albright v. Oliver,

510 U.S. 266, 272 (1994) (citing <u>Hurtado v. California</u>, 110 U.S. 516 (1884)).  Nevertheless, charging instruments must meet certain due process standards.  The sufficiency of a charging instrument is measured by two criteria: "first, whether [it] contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." <u>Russell v. United States</u>, 369 U.S. 749, 763-64 (1962) (internal citations omitted).

> In determining whether the notice in an indictment is sufficient to afford a defendant due process, the question is whether under the circumstances there was reasonable notice and information of the specific charge against him and a fair hearing in open court. <u>Paterno v. Lyons</u>, 334 U.S. 314, 320, 68 S.Ct. 1044, 1047, 92 L.Ed. 1409 (1948).  The indictment must be read as a whole. <u>Wojtycha v. Hopkins</u>, 517 F.2d 420 (3d Cir. 1975).

<u>Bibby v. Tard</u>, 741 F.2d 26, 29 (3d Cir. 1984).

Here, Petitioner had notice, well in advance of trial, of the specific nature of the type of criminal offense, a sexual assault or contact, that he was alleged to have intended.  The proceedings were conducted in such a manner as to permit Petitioner to avoid double jeopardy for the offense.  The charging instrument did not deprive Petitioner of his right to due process.  Petitioner is not entitled to relief on this claim.

E.    <u>Prosecutorial Misconduct/Use of Perjured Testimony</u>

Petitioner asserts that the prosecutor knowingly used perjured testimony, because during the pre-trial suppression hearing Officer Michael Simonetti stated under oath that he did not find a lighter, matches, or anything capable of producing fire while, at trial, he stated that he did find a lighter but that he threw it away because the county jail would not take it into storage with Petitioner's other personal property.  The testimony regarding the presence of the lighter was used, at trial, to support the alleged confession by Petitioner that he was smoking crack.

In addition, Petitioner asserts a claim of prosecutorial misconduct with regard to the prosecutor's closing statement. More specifically, in his closing statement, Petitioner attacked the victim's credibility and argued that the lack of fingerprint evidence linking him to the crack pipe was indicative of his innocence:

> Furthermore, Ms. Esposito testified I never left the bench. I never moved toward her, that I never got up. That she didn't see any pictures on the bench. What is she afraid of? I'm sitting on the bench. When she saw me when the officer came I'm sitting on the bench. She testified she was stressed before she approached me and nervous but never looked back after speaking to me, nor did she dial 9-1-1 on the cell phone she says she had with her at all times until she reached Pond Road on the other side of the park.
>
> Now, she says it takes 15 minutes to get to the other side. She's nervous. She's afraid. This guy might drag me into the woods. But she don't dial 9-1-1 until

she gets to the other side of the park. She walks 200 feet to the exit or more then to the other side of the park, then decide[s] to call 9-1-1. You heard Officer McNamara testify when he got there he saw her. Where is the couple that walked with her back there? She's so terrified, why would they leave her? I'm there. Came out the other end of the park. The officer testified he told McNamara to stay there with her. Why would they leave her? This is such a terrifying event, a guy is trying to accost a woman, drag her into some woods, commit a criminal offense with her. Why would you leave her? Why would she be standing there by herself?

That's the question you have to ask yourself. Was she really scared? Was she really paralyzed? Was she nervous? What is this about? I asked her, she sat there on that stand, I asked her if I made any sexual innuendos. She said no. Then I said did I make any hints? And she said yes. To me what you said was, 'And I wasn't going over there to find out.'

. . . .

[The crack pipe] was sent to the laboratory. . . . Trace amounts of cocaine in it. There was no test done for DNA, [or] fingerprints. This is glass. . . . Fingerprints are everywhere. The car windows. Screen doors. . . . Simple. We're not living in the 19th Century, the 20th Century. It's the 21st Century. We got advanced technology. . . . Officer Simonetti didn't request to have that crack pipe tested for fingerprints, [or] DNA. He said I was smoking it. Then they could get your DNA off it. Money is not a thing to the State. They have unlimited resources to investigate and detect crime. . . . You have to think, why, why wouldn't he, why wouldn't he?

(Answer, Ex. 11, at 33-34, 42-44.)

Thereafter, the prosecutor addressed the jury as follows:

The reasonableness or the unreasonableness of the testimony the witness has given. Karen Esposito goes for a walk. And she's walking through the park she says as she has on many occasions -- I don't know if you have ever traveled or done it yourself when you are away, hey, would you take my picture. Hey, it's either you asking or someone asking you, do me a favor, take

my picture. She says yes. She says he asked her if she
knew how to work the camera. She said yes. She asked
him what background. He says let's go over there. He
points to the woods. She says -- is this reasonable?
She starts to get a little nervous. He comes up with
the 20-dollar bill. Here's $20. Come on, let's go.
Let's go over there.

        You know what?  Defense argues to you that it
shows that he had no intent.  He doesn't get up.  Maybe
it's because his pants are down.  She can't see his
lap.  If she's walking on a path and he wants someone
to take his picture while there's obviously other
people in the park, there was a couple in the park
unless Karen of course is lying about that.  He doesn't
even approach her.  Hay, you come over here.  Why?  How
far is the path from the bench?  Why can't he get off
the bench?  Bring the camera to the lady, say would you
mind taking a picture of my injured eye?  If that's
what he wanted.  But he gets her off the path.  Come
here.  And he doesn't get up.  We know he can walk.  We
know he drove a car.

. . .

        She said that made her totally nervous. She's
like, I'll be right back. Now, is it reasonable? You
are either a woman or you have a wife or a daughter, a
mother. How would they react in that situation? Not in
speculation, just plain common everyday occurrences in
their lives. Someone is behind you, you look. You
immediately start running. I'm just going to walk. I'm
just going to act natural. Just get the heck out of
here. Not going to alert him. I'm not going to alarm
him. Is that reasonable?

. . . .

        . . . They didn't take fingerprints of the crack
pipe. Defense argues to you that you can find
fingerprints everywhere. This is not CSI. There's
absolutely no evidence whatsoever about where you can
and cannot get fingerprints or DNA. The circumstances
under which it's done and anything you see on
television to the contrary is not evidence.

        You have to decide, can you get fingerprints off
that? This is a crack pipe. How big is a fingerprint?

27

> How much of a fingerprint do you need to get enough of
> a fingerprint to identify the person who held the
> object? There's a confession. Good enough.

(Answer, Ex. 11, at 61-62, 71-72.)

With respect to the prosecutor's remarks detailed above, Petitioner challenges the prosecutor's tactic of asking jurors to put their mothers and daughters in the position of the victim in this case, and of suggesting to jurors that they should not consider the lack of fingerprint evidence on the crack pipe because there was no evidence introduced about fingerprints. Petitioner argues that he was not compelled to produce a fingerprint expert in order to make an argument that the State had failed to produce fingerprint evidence.  To the contrary, he notes, the trial court instructed jurors that reasonable doubt could arise from a lack of evidence.

At its hearing on Petitioner's motion for judgment of acquittal or new trial, the trial court rejected his claims of prosecutorial misconduct based upon the alleged presentation of perjured evidence.

> The defendant argues that Prosecutor Leschot
> knowingly presented false testimony to this particular
> jury.  I don't find that she knowingly presented false
> testimony to this jury.  I find that there was
> inconsistencies in the testimony which the defendant
> brought out before the jury.  They heard those
> inconsistencies.

(Answer, Ex. 14, Tr. of Post-Trial Motions at 15.)   The Appellate Division found that this entire allegation of error lacked sufficient merit to warrant discussion.

The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

<u>Id.</u> at 18.

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. <u>Darden</u>, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001).

Here, the trial court's determination that the prosecutor had not knowingly presented perjured testimony is reasonable in light of the evidence before that court.  In addition, while it may not have been the best tactic for the prosecutor to ask the jurors to think about how women in their lives would have reacted to the situation, the remarks clearly were responsive to the Petitioner's suggestion that the victim's behavior was not rational, as were the prosecutor's remarks about the lack of

fingerprint evidence.  The prosecutor's remarks did not infect the trial with unfairness or deprive the Petitioner of due process.  The Appellate Division's determination that this claim is lacking in merit is neither contrary to, nor an unreasonable application, of governing Supreme Court law, nor is the decision of the Appellate Division unreasonable in light of the evidence before it.  Petitioner is not entitled to relief on this claim.

F.   Jury Instructions

Petitioner has asserted various claims of error with respect to the jury instructions.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where

31

"the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997). See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge. If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

Thus, even if there is "'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (internal citations omitted).

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972).  "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Victor v. Nebraska, 511 U.S. 1, 22 (1994); see also Cage v. Louisiana, 498 U.S. 39, 41 (1990).  As the Supreme Court explained in Victor,

> so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.

33

<u>Victor</u>, 511 U.S. at 6 (citations and internal quotation marks omitted).

"[A] misdescription of the burden of proof ... vitiates <u>all</u> the jury's findings. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993) (emphasis in original). Such an error is considered structural and thus is not subject to harmless error review. <u>See id.</u> at 280-82. <u>But see</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

1. <u>Spoliation</u>

Petitioner asserts that he was deprived of his due process rights by the trial court's failure to give a jury instruction on "spoliation." He argues that the court should have informed the jurors that they could draw an adverse inference against the State for failing to preserve relevant evidence, specifically, the 9-1-1 tape and the lighter allegedly found at the scene. The Appellate Division found that this allegation of error lacked sufficient merit to warrant discussion.

Petitioner has not established, or even argued, that the omitted instruction had the effect of relieving the government of its obligation to prove every element of the crime beyond a reasonable doubt. Petitioner is not entitled to relief on this claim.

2.  <u>Constructive Possession</u>

Petitioner asserts that he was deprived of his due process rights by the trial court's erroneous and contradictory jury instruction on the law of constructive possession.  He argues that the State proceeded on a theory that Petitioner had constructive possession of crack cocaine, based upon the presence of crack cocaine on the pipe collected at the scene.

Petitioner argues that the trial court instructed the jury that, "Constructive possession means possession in which the person does not physically have the property, but though not physically on one's person, he is aware of the presence of the property and is able to exercise intentional control or dominion over it."  Petitioner argues that a correct instruction would have provided that constructive possession requires intentional control over the item, not merely the "ability" to exercise intentional control.  Thus, Petitioner argues, the instruction erroneously permits conviction if jurors merely find that a person has the knowledge and ability to exercise control over an item, here the crack cocaine, even without any <u>intent</u> to exercise control over the item.  In support of this position, Petitioner cites <u>State v. Gaines</u>, 135 N.J.Super. 240, 245 (App.Div. 1975), <u>aff'd</u>, 75 N.J. 83 (1977).  Petitioner also concedes that the trial court "contradicted" itself by telling the jury that constructive possession also means an ability and an intent to

35

exercise control, but argues that the jury should not have been required to determine which of the "contradictory" instructions to follow.  The Appellate Division found that this allegation of error lacked sufficient merit to warrant discussion.

Here, the trial court provided the jury with the following instruction on the law of possession:

> The word "possess" as used in the criminal statute signifies a knowing intentional control over a designated thing accompanied by a knowledge of its character. Thus, the person must know or be aware that he possesses the item, in this case cocaine, and he must know what it is that he possesses or controls; that it is cocaine.

> This possession cannot be merely a passing control that is fleeting or uncertain in its nature. In other words, to possess within the meaning of the law the defendant must knowingly procure or receive the item possessed or be aware of his control thereof for a sufficient period of time to have been able to relinquish his control if he chose to do so.

> A person may possess cocaine (an item) even though it was not physically on his person at the time of his arrest if he had in fact at some point in time prior to his arrest had control and dominion over it. When we speak of possession we mean a conscious, knowing possession.

> The law recognizes two kinds of possession. They are actual possession and constructive possession. A person is [in] actual possession of a particular thing when he knows what it is, that he has knowledge of its character and knowingly has it on his person at a given time. I have actual possession of this cup.

> The law recognizes that possession may be constructive instead of actual. A person who, with knowledge of its character, knowingly has direct control over a thing at a given time, is in actual possession of it. Constructive possession means possession in which the person does not physically have

the property. But though not physically on one's person, he is aware of the presence of the property and is able to exercise intentional control and dominion over it.

I have some books that belong to me on this table here. They're not in my actual, physical control in the sense that I don't have them on my person, but they are constructively in my possession.

A person who, although not in actual possession, has knowledge of its character, knowingly has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.

(Answer, Ex. 11, Tr. at 117-119.)

In <u>State v. Brown</u>, 80 N.J. 587 (1979), the New Jersey Supreme Court approved the following jury instruction on constructive possession, holding the instruction sufficient because, taken as a whole, it explained the all the essential elements of the crime of possession - knowledge and control:

[Constructive possession is defined as] possession in which the property, though not physically on one's person, is so located that he is aware of the presence of the property and is able to exercise intentional control over it, go to it and get it and obtain it . . . .

If it's on premises over which you exercise control and dominion, you have constructive possession of what's on it. Books on my book shelf, I don't have them in my hands but I can go and take the book, it's mine. I have possession of it, would be an illustration. On premises or over which you exercise control and dominion, one may be said to have constructive possession. . . .

One may have actual possession on one's person. One may have constructive possession if it's on the premises over which you exercise dominion and control and you

37

can go to it if you want, take it in your hand. That
would be constructive possession. . . .

The State must prove indeed the substance seized was
heroin; two that the defendant Knew that he possessed
or had it under his control; three, the defendant Knew
that he possessed it; four, the defendant Intended to
possess it. . . .

In addition to intent, possession requires knowledge,
that is knowledge by the defendant of the character of
that which he possessed. It is possible to possess
something without knowing it, but such possession is
not possession within the meaning of this law.

80 N.J. at 600-01.

Similarly, here, the trial court's instruction on
constructive possession, taken as a whole, explained the
essential elements of the crime of possession - knowledge and
control.  The instruction here is substantially similar to the
instruction approved by the Supreme Court of New Jersey in State
v. Brown.  To the extent the Appellate Division decision could be
construed as a finding that this instruction complied with state
law, that decision is binding in this proceeding.  To the extent
the Appellate Division decision could be construed as a finding
that the challenged instruction comports with constitutional
demands, that decision is neither contrary to nor an unreasonable
application of controlling U.S. Supreme Court precedent.
Petitioner is not entitled to relief on this claim.

G.   Sufficiency of the Evidence

Petitioner asserts that there was insufficient evidence to
sustain his conviction for possession of crack cocaine, because

38

the testimony placing Petitioner in possession of the crack pipe was contrived and false.  The Appellate Division found that this allegation of error lacked sufficient merit to warrant discussion.

A claim that the jury's verdict was against the weight of the evidence raises a due process concern.  Only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should the writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law."  Jackson, 443 U.S. at 324, n.16.  See also Orban v. Vaughn, 123 F.3d 727 (3d Cir. 1997), cert. denied, 522 U.S. 1059 (1998).  As noted above, state court factual determinations are presumed to be correct.  See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir. 2000).

Here, the testimony of police officers that Petitioner had been holding the crack pipe, which he then threw or dropped onto the ground at his feet, along with the evidence that residue of crack cocaine was found in the pipe, are sufficient to sustain the conviction for possession of crack cocaine.  Petitioner has failed to establish a due process violation.  He is not entitled to relief on this claim.

IV.   <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, jurists of reason would not disagree with this Court's finding that Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


<u>s/Freda L. Wolfson</u>
Freda L. Wolfson
United States District Judge

Dated: August 15, 2011

40